1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

SALVADOR MENA,

11

              Plaintiff,                   No. CIV S-03-2024 MCE GGH P

12

     vs.

13

MIKE KNOWLES, et al.,

14

              Defendants.            FINDINGS AND RECOMMENDATIONS

15

                                      /

16

Introduction

17

           Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. §

18

1983.  Pending before the court is defendants' motion for summary judgment, filed on June 30,

19

2006, to which plaintiff filed his opposition on August 21, 2006; defendants' reply to the

20

opposition was filed on October 2, 2006.[1]

21

\\\\\

22

\\\\\

23

\\\\\

24

25

[1] The putative reply to defendants' reply, plaintiff filed on October 10, 2006, is not a filing contemplated by the Federal Rules of Civil Procedure or the Local Rules and will not be considered in the adjudication of the pending motion.

26

1  Complaint

2        The court sets forth its prior rendering[2] of plaintiff's allegations with any requisite

3  modifications, including defendant Schimon's motion for summary judgment having been

4  granted previously.[3]  This action proceeds on plaintiff's original complaint, filed on September

5  26, 2003, as modified by the March 3, 2006, Order, noted at footnote 3 below and by the Order,

6  filed on February 23, 2005, adopting the September 24, 2004, Findings and Recommendations,

7  and dismissing defendant Wolfe.  Named as defendants are: Mike Knowles; Brett Williams; Glen

8  Douglas; Christopher Smith; Gilbert Sainz.  Defendants Williams, Douglas, Smith, Sainz are or

9  were physicians employed at Mule Creek State Prison (MCSP).  Defendant Williams is the

10  current Chief Medical Officer (CMO); defendant Sainz is the former CMO.  Defendant Knowles

11  was the warden of MCSP at the time this action was filed.  To the extent that plaintiff by this

12  action seeks prospective injunctive relief, the current warden, Roseanne Campbell, in her official

13  capacity only, is substituted in as a defendant, pursuant to Fed. R. Civ. P. 25(d)(1).  Former

14  defendant Schimon is employed at Doctor's Hospital at Manteca and alleged to be contracted by

15  the state to provide medical services.  Form Complaint, p. 2.  (Wolfe was also employed by

16  contract to MCSP).[4]

17        On or about July 10, 1998, plaintiff was diagnosed with prostate cancer at

18  California Men's Colony - East.  Form Complaint, p. 3.  Following several medical

19  consultations, plaintiff declined "any and all radical medical procedures," electing to let nature

20  take its course.  Id.  Plaintiff had sought medical attention principally because of intermittent

21  pain and he was prescribed Tylenol # 3.  Id.  Between May, 1999 and April 12, 2000, plaintiff

22  _____

23     [2] See Findings and Recommendations, filed on February 24, 2005, pp. 1-5, adopted by

24  Order, filed on April 19, 2005; see also, Order, filed on May 13, 2005.

25     [3] See, Order, filed on March 3, 2006, adopting Findings and Recommendations, filed on
January 19, 2006.

26     [4] See Complaint, appended to the Form Complaint, p. 2.

1   used Tylenol # 3 twice daily.  Plaintiff was interviewed at California State Prison (CSP) -

2   Sacramento by a registered nurse and Dr. Penner, non-defendants, and it was determined that

3   Tylenol # 3 was not appropriate for treating cancer pain.  Id.  MS-Contin was discussed at length

4   and its effect of deadening pain was pointed out.  Id.

5              In the pages of his complaint, attached to the Form Complaint, plaintiff sets forth

6   that he seeks prospective injunctive relief only and that he has been compelled by defendants to

7   live in constant pain due to his prostate cancer and Hepatitis C virus, "known to be painful

8   conditions," in violation of his rights under the Eighth and Fourteenth Amendments.  Complaint,

9   p. 1.  Plaintiff alleges that defendant Sainz, CMO at MCSP from 2000 until 2002, "was

10  instrumental" in discontinuing plaintiff's previously prescribed medications.  Complaint, p. 2.

11  Defendant Knowles was personally aware of the chronic pain plaintiff suffered.  Id., pp. 2, 3.

12  Defendants Douglas and Smith have rotated assignments as A-yard physicians.  Id., p. 3.

13             On July 3, 1998, plaintiff, at the time 54 years old, underwent a prostate needle

14  biopsy.  Complaint, p. 3, Exhibit (Exh. E), pp. 1-2.  As noted, on July 10, 1998, plaintiff learned

15  he had prostate cancer; plaintiff declined radical intervention.  Complaint, p. 3.  On August 5,

16  1998, plaintiff had a consultation with a radiologist, Dr. Fishburn (not a defendant), at French

17  Hospital.  Complaint, p. 3, Exh. E, pp. 3-4.  A full body bone scan was conducted on plaintiff on

18  September 28, 1998.  Complaint, p. 4, Exh. E, pp. 5-7.  Plaintiff alleges that he signed a "refusal

19  of examination and/or treatment" for his prostate cancer condition; however, the exhibit he

20  provides in support of that allegation, dated December 13, 1998, indicates that he actually

21  refused to sign the form.  Id., Exh. E, p. 8.  In March, 2000, plaintiff had several x-rays, which

22  noted anomalies.  Id., Exh. E, pp. 9-10.  Plaintiff was scheduled for a new bone scan on May 23,

23  2000.  Id., Exh. E, p. 11.  On August 15, 2000, plaintiff was examined by an oncologist at

24  California Medical Facility.  Id., Exh. E, p. 12.  Plaintiff alleges that he was prescribed MS-

25  Contin throughout March of 2000; however, the exhibit he cites appears to demonstrate that

26  defendant Sainz prescribed him dosages of MS-Contin for 30 days, among other prescription

1   medications, on September 1, 2000.  Id., Exh. E, p. 13.  In fact, on September 1, 2000, defendant

2   Sainz appears to have ordered E.R. to give plaintiff one dose of 15 mgm. of MS-Contin that

3   evening.  See, Exh. E, p. 13.  On September 12, 2000, defendant Douglas signed a notation

4   stating: "I feel this inmate is using his medical condition to solicit narcotics and will continue to

5   refuse definitive treatment in service of his addiction and to his medical detriment."  Id., Exh. E,

6   p. 14.

7           On November 29, 2000, plaintiff was interviewed by defendant Sainz and was

8   told that he was to have a new bone scan of his back and then be referred again to the oncologist

9   Dr. Hashimi, not a defendant, which plaintiff found inexplicable.  Complaint, p. 4, Exh. E, pp.

10  15-17.

11          Plaintiff alleges that upon his August 23, 2000, arrival at MCSP, defendant

12  Douglas, the on-call physician, refused to honor his prior MS-Contin prescription.  Complaint,

13  pp. 4-5.  Plaintiff was admitted into the infirmary and, on August 24, 2000, plaintiff was asked

14  by defendant Douglas: "Why were you transferred here if you have cancer?"  Complaint, p. 5.

15  After conducting a cursory examination and with incomplete information, defendant Douglas

16  concluded plaintiff was a drug-seeker and wrote a "scathing report," accusing plaintiff of being a

17  drug-seeker.  Id., Exh. B, pp. 14, 18-19.[5]  On September 12, 2000, defendant Douglas in a report

18  sent to Doctor's Hospital of Manteca stated: "Mr. Mena is a 66-year-old known heroin addict."

19  Id., Exh. B, p. 20.  On October 10, 2000, plaintiff was interviewed by former defendant Schimon

20  at Doctor's Hospital of Manteca for three to five minutes, after which terse interview this former

21  defendant submitted a report including a description of plaintiff as a "56-year-old known heroin

22  \\\\\

23  \\\\\

24  _____

25      [5] Plaintiff's exhibit cites the report at pages 14-17 of Exh. B, but the report was split up within his exhibit.  At points where plaintiff cites to page numbers that conflict with the actual page count of the exhibit, or where a report has been separated by other documents, the court

26  only notes the correct page count or accurate page number(s) of his unnumbered exhibit pages.

1  addict." Id., Exh. B, pp. 21-22.[6]  Plaintiff was told, on October 16, 2000, by defendant Sainz that

2  the decision to continue or discontinue his MS-Contin prescription rested on the second opinion

3  to be provided by the urologist at Manteca (former defendant Schimon).  Id., Exh. B, p. 15.  It

4  was this "non-existent" second medical opinion, apparently supportive of the medical opinion of

5  defendant Douglas that plaintiff "did not suffer sufficient prostate cancer to merit MS-Contin,"

6  which led to plaintiff's being deprived of both that prescription and any other pain relief

7  medication.  Id.

8           On March 14, 2003, defendant Williams, CMO, in essence, apologized for the

9  lack of adequate medical care provided plaintiff by defendants Douglas and Smith, thanking him

10 for his patience.  Complaint, p. 6, Exh. E, p. 18.  Plaintiff alleges that he also received an apology

11 from a Dr. Hortensen (not a defendant) for irregular treatment.  Complaint, p. 9.  On March 28,

12 2003, defendant Williams re-issued plaintiff's MS-Contin prescription, advising plaintiff not to

13 seek medical care from the A-yard clinic where defendant Douglas was practicing.  Id., Exh. E, p.

14 22.  Defendant Williams admitted that the October 10, 2000, second medical opinion was

15 "tainted," and plaintiff was sent to Manteca, at which hospital a physician's assistant prescribed

16 plaintiff antibiotics for a urinary tract infection, ordered a new full blood panel, bone scan and

17 possibly a new prostate needle biopsy, to all of which plaintiff agreed.  Id.

18          On May 5, 2003, defendant Williams told plaintiff that if he did not undergo

19 radical medical procedures, he would have to be satisfied with Neurotin to assuage his cancer

20 pain.  Id.  Plaintiff's MS-Contin prescription expired on July 4, 2003.  Id., Exh. E, p. 22.

21 Plaintiff informed defendant Williams by way of a note on July 1 and July 3, 2003, that his pain

22 prescription was due to expire.  Complaint, p. 7.  Defendant Williams has provided no additional

23 reasons for discontinuing plaintiff's pain medication and plaintiff alleges that he has discontinued

24 the medication in order to pressure plaintiff into undergoing radical medical procedures.  Id., pp.

25

26          [6] Records submitted by plaintiff note his date of birth as May 17, 1944.  The court
observes that defendant Douglas' report adds ten years to plaintiff's actual age.

7-8.  Plaintiff alleges that defendants continued refusal of adequate pain relief is based in part on

his history as a drug user, which past should not preclude treatment for the pain that he suffers as

a result of his prostate cancer and Hepatitis C virus, and that defendant Williams has

acknowledged this.  Id., p. 9.  Plaintiff seeks injunctive (and declaratory) relief in the form of,

inter alia, examination and a prescribed course of treatment at the U.C. Davis Medical Center

cancer unit with which defendants must comply.  Id., p. 9-12.

Motion for Summary Judgment

Defendants move for summary judgment with prejudice on the grounds that the

evidence shows that all medical defendants provided plaintiff with reasonable and necessary care

in an effort to treat plaintiff's complaints of pain and no defendant was deliberately indifferent to

any medical need plaintiff has.  Motion for Summary Judgment (MSJ), pp. 1-11.

*Legal Standard for Summary Judgment*

Summary judgment is appropriate when it is demonstrated that the standard set

forth in Fed. R. Civ. P. 56(c) is met.  "The judgment sought shall be rendered forthwith if . . .

there is no genuine issue as to any material fact, and . . .  the moving party is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(c).

Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct., 2548, 2553 (1986).  "[W]here the

nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

1  party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.  "[A] complete

2  failure of proof concerning an essential element of the nonmoving party's case necessarily

3  renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be

4  granted, "so long as whatever is before the district court demonstrates that the standard for entry

5  of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

6          If the moving party meets its initial responsibility, the burden then shifts to the

7  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

8  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

9  (1986).  In attempting to establish the existence of this factual dispute, the opposing party may

10  not rely upon the allegations or denials of its pleadings but is required to tender evidence of

11  specific facts in the form of affidavits, and/or admissible discovery material, in support of its

12  contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

13  106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

14  material, i.e., a fact that might affect the outcome of the suit under the governing law, see

15  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

16  Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

17  dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

18  nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

19          In the endeavor to establish the existence of a factual dispute, the opposing party

20  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

21  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

22  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

23  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

24  genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

25  56(e) advisory committee's note on 1963 amendments).

26  \\\\\

1	In resolving the summary judgment motion, the court examines the pleadings,

2	depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

3	any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

4	477 U.S. at 255, 106 S. Ct. at 2513.  All reasonable inferences that may be drawn from the facts

5	placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S.

6	at 587, 106 S. Ct. at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the

7	opposing party's obligation to produce a factual predicate from which the inference may be

8	drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

9	aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

10	party "must do more than simply show that there is some metaphysical doubt as to the material

11	facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the

12	nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct.

13	1356 (citation omitted).

14	On April 9, 2004, the court advised plaintiff of the requirements for opposing a

15	motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

16	F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999), and Klingele v.

17	Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

18	*Undisputed Facts*

19	Defendants assert that the following facts are undisputed.  Defendant Rosanne

20	Campbell, the current acting warden of Mule Creek State Prison (MCSP), has never been

21	deliberately indifferent to plaintiff's medical needs and does not have control or authority over

22	the medical care provided to inmates.  DUF #1, Exhibit (Ex.) A, Campbell Declaration (Dec.), ¶¶

23	1-4.

24	Defendant Mike Knowles is the former MCSP warden and has never denied

25	plaintiff necessary and appropriate medical care.  Defendant Knowles is retired and has no

26	control over the medical care provided to plaintiff.  DUF #2, Ex. B, Knowles Dec., ¶¶ 1-5.

Defendant Brett Williams, M.D., is the Chief Medical Officer, Health Care Manager at MCSP.  Defendant Williams provided plaintiff with effective pain medication and medical care consistent with the standards in the medical community and never denied plaintiff necessary or appropriate treatment.  DUF #3, Ex. C, Williams Dec., ¶¶ 1-5.

Defendant Glen Douglas, M.D., is a physician employed at MCSP.  Defendant Douglas provided plaintiff with effective pain medication based on assessed clinical needs, provided medical care consistent with the standard of care in the medical community, and never denied plaintiff necessary or appropriate treatment.  DUF #4, Ex. D, Douglas Dec., ¶¶ 1-8.

Defendant Gilbert Sainz, M.D., is now retired from the California Department of Corrections, Mule Creek State Prison and has no control or authority over plaintiff's medical care.  During the 4 ½ years defendant Sainz was at MCSP, defendant Sainz provided plaintiff with care and treatment in compliance with the standard of care in the medical community and did not deny plaintiff necessary and adequate care.  DUF #5 Ex. E, Sainz Dec., ¶¶ 1-8.

Defendant Christopher Smith, M.D., is employed as Chief Physician and Surgeon at Mule Creek State Prison.  Defendant Smith provided care and treatment to plaintiff in compliance with the standard of care in the medical community, provided plaintiff with effective pain medication and did not deny plaintiff necessary or appropriate medical care.  DUF #6, Ex. F, Smith Dec., ¶¶ 1-7.

Defendant Drs. Williams, Douglas, Sainz and Smith agree with the opinion of the court's independent medical expert, Dr. Christopher Evans, that plaintiff has received appropriate care at Mule Creek State Prison.  DUF #7, Exs. C-F, Williams Dec., ¶ 5; Douglas Dec., ¶ 9, Sainz Decl., ¶ 5; Smith Dec., ¶ 7.

The court observes, although it is not separately set forth as such by any party, that there is no dispute that plaintiff is afflicted with the medical conditions of prostate cancer, osteoarthritis, and Hepatitis C.  Defendants submit as Ex. G, the opinion letter of the court's

\\\\\

appointed independent expert.  The court separately takes judicial notice[7] of the findings of its

independent medical expert, Dr. Christopher Evans, of the University of California at Davis

(UCD), School of Medicine, Department of Urology, who was indisputably appointed by the

undersigned to assist the court in assessing plaintiff's medical condition independently of the

medical assessments of the defendants and to provide plaintiff pro se with an independent

medical evaluation in order to determine whether relief in the form of a preliminary injunction

might be warranted.  Dr. Evans' findings are undisputed and are set forth in their entirety herein:

> In my appointment as the court's independent medical expert in the case of Salvador Mena vs. Mike Knowles et al. (UNITED STATES DISTRICT COURT case number [] CIV S-03-2024 MCE GGH P) I have reviewed the medical records.  Per our discussion I have also discussed the case at the University of California Davis Cancer Center Genitourinary Tumor Board.  The summary of my findings and the consensus opinion of the tumor board is below.
>
> Mr. Mena presented with a prostate nodule and PSA of 1.3 in July 1998.  At that time he underwent a prostate biopsy, which demonstrated a Gleason score 7 (3 + 4) adenocarcinoma of the prostate in 1 of 6 cores.  He had a metastatic work up to include a bone scan.  The bone scan showed some uptake in a variety of areas including his distal femur and plain films were obtained for this.  The lesions in the bone were lytic, not blastic.  When prostate cancer metastasizes to bone i[t] usually appears as a blastic lesion in 90% of cases.  He did not appear blastic.  The patient's past medical history according to the records includes arthritis, degenerative joint disease, psychosis and a history of opiate dependency.
>
> Mr. Mena declined definitive treatment for his prostate cancer, such as radiation therapy or surgery.  He desired supportive care over the ensuing years mainly with the use of morphine sulfate.  However, he had several further bone scans in 2000, 2001 and 2003.  None of these showed any evidence of prostate cancer metastases.  He had additional "plain films" which again were not supportive for metastases.  He also had alkaline phosphatase which would be elevated in the face of metastases.  These tests were all normal.  The blood level of PSA is another good indication of

---

[7] Judicial notice may be taken of court records.  Valerio v. Boise Cascade Corp., 80 F.R.D. 626, 635 n.1 (N.D. Cal. 1978), aff'd, 645 F.2d 699 (9th Cir.), cert. denied, 454 U.S. 1126 (1981).

1
2
3

whether a patient with prostate cancer has metastases.  His PSA
was initially 1.3 (normal less than 4) in between July 1998 and
October 2004[;] it has really never changed.  In July in 2001[,] it
went to 5.35 but then returned down to below 2.5 over the ensuing
2 years and most recently in October 2004[,] it was only 1.8.

4
5
6
7
8
9
10
11
12
13
14
15
16
17

My opinion and that of the genitourinary tumor board is that it is
extremely unlikely that Mr. Mena has any prostate cancer
metastases.  This is based upon his numerous x-rays not supporting
this diagnosis and his very stable and low PSA.  The likel[i]hood
of having any pain requiring narcotics with prostate cancer as the
underlying cause is extremely remote in the absence of metastasis.
It is also unlikely that his arthritis and generative joint disease
would cause this degree of pain in the view of the Tumor Board,
however, this will ultimately need to be evaluated by a specialist
such as a rheumatologist.  Mr. Mena did see a specialist in physical
medicine and rehabilitation who felt that he had no etiology for his
pain.  We do agree that it is Mr. Mena's right to decline definitive
local therapy and psychiatric evaluations have indicated that he is
capable of making an informed decision.  However, the
cons[ensus] opinion is that narcotics are not an appropriate
treatment for localized prostate cancer as it does not cause pain.
He has been appropriately evaluated for confounding psychiatric
conditions such as depression which may play a role in how he is
feeling and these have been adequately evaluated.  As such, we feel
he has received appropriate care and that the administration of
narcotics would be inappropriate for the treatment of his prostate
cancer.  While we did take in to account Mr. Mena's history of
opiate dependence, which obviously may play a role in his desire
for narcotics, we based our discussion and decision upon the
medical data regarding his prostate cancer and feel that based on
that and that alone, narcotics are not warranted for the treatment of
his prostate cancer. []⁸

18  Opinion Letter, signed by Christopher P. Evans, M.D., Associate Professor, Urological Surgical

19  Oncology, dated May 4, 2005, and filed in this court on May 13, 2005.

20  <u>*Legal Standard for Eighth Amendment Claim*</u>

21          In order to state a § 1983 claim for violation of the Eighth Amendment based on

22  inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

23  deliberate indifference to serious medical needs."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106, 97 S. Ct.

24

25

26

_____

        ⁸ In the final line of the letter, Dr. Evans courteously invites the undersigned to contact
him should the court have any further questions regarding "this expert medical opinion."  <u>Id.</u>
However, the court found the analysis in the letter lucid and comprehensive and determined that
follow-up questions would be unnecessary.

285, 292 (1976). To prevail, plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir. 1992) (on remand). The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Indications that a prisoner has a serious need for medical treatment are the following: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. See, e.g., Wood v. Housewright, 900 F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01 (9th Cir. 1989). McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court defined a very strict standard which a plaintiff must meet in order to establish "deliberate indifference." Of course, negligence is insufficient. Farmer, 511 U.S. at 835, 114 S. Ct. at 1978. However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm which is so obvious that it should be known) is insufficient. Id. at 836-37, 114 S. Ct. at 1979. Neither is it sufficient that a reasonable person would have known of the risk or that a defendant should have known of the risk. Id. at 842, 114 S. Ct. at 1981.

It is nothing less than recklessness in the criminal sense—a subjective standard— disregard of a risk of harm of which the actor is actually aware. Id. at 838-842, 114 S. Ct. at 1979-1981. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837, 114 S. Ct. at 1979. Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

1  of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at

2  847, 114 S. Ct. at 1984. "[I]t is enough that the official acted or failed to act despite his

3  knowledge of a substantial risk of serious harm." Id. at 842, 114 S. Ct. at 1981. If the risk was

4  obvious, the trier of fact may infer that a defendant knew of the risk. Id. at 840-42, 114 S. Ct. at

5  1981. However, obviousness per se will not impart knowledge as a matter of law.

6          Also significant to the analysis is the well established principle that mere

7  differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth

8  Amendment violation. Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon,

9  662 F.2d 1337, 1344 (9th Cir. 1981).

10         Moreover, a physician need not fail to treat an inmate altogether in order to violate

11 that inmate's Eighth Amendment rights. Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir.

12 1989). A failure to competently treat a serious medical condition, even if some treatment is

13 prescribed, may constitute deliberate indifference in a particular case. Id.

14         Additionally, mere delay in medical treatment without more is insufficient to state

15 a claim of deliberate medical indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766

16 F.2d 404, 408 (9th Cir. 1985). Although the delay in medical treatment must be harmful, there is

17 no requirement that the delay cause "substantial" harm. McGuckin, 974 F.2d at 1060, citing

18 Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-

19 1000. A finding that an inmate was seriously harmed by the defendant's action or inaction tends

20 to provide additional support for a claim of deliberate indifference; however, it does not end the

21 inquiry. McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992). In summary, "the more serious the

22 medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those

23 needs, the more likely it is that a plaintiff has established deliberate indifference on the part of

24 the defendant." McGuckin, 974 F.2d at 1061.

25         Superimposed on these Eighth Amendment standards is the fact that in cases

26 involving complex medical issues where plaintiff contests the type of treatment he received,

1   expert opinion will almost always be necessary to establish the necessary level of deliberate

2   indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there

3   may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the

4   treatment he received equated with deliberate indifference thereby creating a material issue of

5   fact, summary judgment should be entered for defendants.  The dispositive question on this

6   summary judgment motion is ultimately not what was the most appropriate course of treatment

7   for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

8   criminally reckless.

9                     *Defendants Williams, Douglas, Smith and Sainz*

10                 In their motion, defendants note that this court's own independent medical expert

11  has found that plaintiff has received the appropriate level of medical care, citing, as noted, the

12  letter from the appointed expert, Dr. Christopher P. Evans, as Ex. G to their motion.  Defendants

13  argue that this case results from plaintiff's difference of opinion regarding the medical treatment

14  he should be receiving, which disagreement is insufficient as a matter of law to rise to an Eighth

15  Amendment claim.  MSJ, p. 10.

16                 In his opposition, plaintiff attempts to raise a dispute as to the facts as set forth by

17  defendants (and by this court), but ultimately fails to raise a genuine issue of material fact.

18  Plaintiff takes issue with the findings of the court's appointed independent medical expert,

19  asserting that Dr. Evans did not examine him and that he relied on documents that plaintiff has

20  called into question.  Opp., p. 2.

21                 Specifically, plaintiff argues that defendant Smith falsely reported that he relied

22  on a report by a pain specialist, whom plaintiff also faults as not being a per se cancer pain

23  specialist, named Dr. John Friend because defendant Smith reported that he had relied on Dr.

24  Friend's examination of plaintiff on November 8, 2000, to support his (Smith's) recommendation

25  that plaintiff not receive MS Contin.  Opp., pp. 8-11.  However, by his own report, Dr. Friend,

26  whom plaintiff concedes did interview him on Nov. 8, 2000, did not conduct a physical

examination or testing (including an electromyographic examination and nerve conduction

studies of the right lower extremity) on plaintiff until Nov. 22, 2000.  Opp., p. 2, Ex. D,

plaintiff's dec. re: defendant Smith, ¶¶ 4-9, 17-20; Ex. F, copy of Dr. Friend's examination and

findings.  Although the court could not find, among plaintiff's opposition exhibits, defendant

Smith's report dated Nov. 8, 2000 (transcribed on 11/9/00), the court was able to locate a copy,

submitted earlier to this court as Ex. B to defendants' response to plaintiff's motion for a

preliminary injunction.  Plaintiff correctly quotes defendant Smith as having stated the following

in his report: "Detailed neurological exam was undertaken by Dr. Friend, PM&R, after my exam,

without abnormalities identified, including any sensory deficits of the back and lower

extremities."  However, plaintiff does not note that in a subsequent section of the report marked

"Plan," defendant Smith states that Dr. Friend concurred with the evaluation of plaintiff thus far,

and that Dr. Friend intended to do an EMG of the right lower extremity as a final diagnostic

procedure, evidently the procedure that was ultimately conducted on Nov. 22, 2000; thus,

plaintiff's premise that defendant Smith has not been accurate as to when an examination by Dr.

Friend took place is not substantiated.  Moreover, even if the court found that defendant Smith

had made the report prematurely, plaintiff's problem is that the substance of the report is not

undermined by the actual exam conducted some two weeks later.  That defendant Smith may

have accurately, but precipitously, anticipated the findings does not raise a genuine dispute on

this point or render Smith's own report sufficiently inherently questionable.

       Plaintiff also suggests a conflict of interest between the court's appointed

independent medical expert and defendant Douglas, apparently based on defendant Douglas'

affidavit, wherein he sets forth that, as well as being employed as a physician and surgeon at the

California Department of Corrections and Rehabilitation (CDCR) at Mule Creek State Prison

(MCSP), he states that he is an Assistant Clinical Professor in the Department of Family Practice

at the UCD Sacramento Medical Center.  Opp., p. 2; MSJ, Ex. D, defendant Douglas dec., ¶ 2.

However, because Dr. Evans and defendant Douglas are apparently both employed at UCD

1   Medical Center, that fact alone is hardly sufficient to raise the specter of a conflict of interest on

2   the part of the court's expert.  Dr. Evans and defendant Douglas are in completely different

3   departments, in different capacities, and in wholly differing fields of specialization; it is not even

4   probable that they know each other at all, but even if they do, that goes no way to demonstrating

5   that this court's appointed expert would be in any way thereby influenced in his professional

6   judgment of plaintiff's medical condition.  Plaintiff's medical conditions and treatment were also

7   assessed and an analytical consensus reached by an entire board of medical specialists, rendering

8   the autonomy and unassailable expertise of the court's expert even more inviolable.

9           Further, as to defendant Douglas, plaintiff faults him particularly for his

10  declaration with respect to plaintiff's 1998 biopsy, evidently for prostate cancer, that the biopsy

11  "may have removed any traces of his cancer...."  Opp., Ex. B, plaintiff's dec. re: defendant

12  Douglas, ¶ 6; MSJ, Ex. D, Douglas dec., ¶ 6.  Defendant Douglas also states that plaintiff

13  "received several whole body scans indicating negative results concerning the spread of cancer."

14  Id.  Plaintiff believes that defendant Douglas' representation that a biopsy could have removed

15  traces of plaintiff's cancer constitutes an incompetent medical opinion or one not based on sound

16  medical practice; unfortunately, plaintiff provides no medical expert evidence to shore up this

17  belief.

18          Plaintiff also argues that defendant Douglas labeled plaintiff "a known heroin

19  addict" for the sole purpose of having other physicians treat him as a drug seeker, a label that has

20  posed obstacles for plaintiff when doctors have attempted to prescribe him medications.  Opp.,

21  pp. 11-13, plaintiff's Ex. B, ¶¶ 9-10 & Ex. N, copy of Douglas' Sept. 2000, request for urology

22  consultation for plaintiff, referring to plaintiff as a "known heroin addict."   Evidence of other

23  physicians' reliance on this assessment by defendant Douglas is produced as plaintiff's Ex. N-1,

24  wherein former defendant Schimon refers to plaintiff at the outset of his October 10, 2000,

25  consultation report, as "a 56-year old known heroin addict...."  While plaintiff claims that this

26  characterization of him is "improper," he, on the other hand, does not affirmatively dispute the

representation in his declaration.  He does not explicitly deny that he has a history as a heroin

addict or drug seeker, merely that defendant Douglas does not explain the connection between

prostate cancer and heroin addiction.  Opp., Ex. B, ¶¶ 11-12.  However, plaintiff does not make a

cogent point with this virtual non sequitur; a connection between heroin addiction and prostate

cancer need not be posited; rather, it is evident that defendant Douglas makes the observation

with regard to plaintiff's substance abuse history in order to highlight that plaintiff may be driven

by motivations other than simply pain treatment in seeking a particular drug.  Plaintiff asserts, for

some reason, in his declaration concerning defendant Sainz (discussed below) that medical staff

reported the following: "[I]n checking the physician's notes, there is no mention of your being a

'known heroin addict.'  Therefore, the allegation is false, as there is no mention of this in your

medical files."  Opp., Ex. C, plaintiff's dec. re: defendant Sainz, ¶ 16, Ex. I, copy of June 5,

2001, second level appeal response.  Plaintiff misconstrues the statement in the second level

appeal response as supporting his position with regard to the description of him as being "a

known heroin addict."  What the appeal response asserts is that plaintiff's allegation that such a

reference was not found in his medical file and plaintiff's allegation that it was there is false, not

whether or not he was a heroin addict was false.

Plaintiff also posits that he was finally successful in addressing the issue with a

physician, a Dr. Horensten who noted: "He feels, unfairly so, he has been labeled a heroin addict

when he has not had any injection of drugs for several years."  Opp., Ex. C, ¶ 17, Ex. I.  This

statement noting what plaintiff believes, however, does not either affirm plaintiff's belief that he

has been unfairly labeled nor provide any basis for any finding that because plaintiff may not

have been recently injecting heroin that he does not have a history of having abused the

substance or that he does not have a drug seeking proclivity.  The court observes that in the

appeal response that Dr. Horensten concluded, inter alia, that he had told plaintiff "that the

Neurontin that has been ordered for him is in fact the widely recognized pain medication for

chronic pain.  He did not seem particularly pleased with my conclusion."  See plaintiff's Ex. I.

As to defendant Williams, plaintiff recounts that this defendant consulted with plaintiff on March 14, 2003, after plaintiff complained of pain due to cancer; plaintiff states that defendant Williams apologized for plaintiff's ill treatment at the conclusion of the interview, and on March 28, 2003, prescribed MS Contin for pain.  Opp., pp. 5-8, Ex. K, a copy of several letters plaintiff evidently directed to defendant Williams; plaintiff's Ex. A, plaintiff's dec. re: defendant Williams, ¶¶ 2-8, 14.   In his declaration, plaintiff sets forth that he complained to defendant Williams that defendants Douglas and Smith had belittled plaintiff's complaints about pain from prostate cancer, that defendant Douglas had doctored his reports, that examinations were not performed and that plaintiff was being denied palliative treatment.  Opp., Ex. A, ¶ 5. Plaintiff claims that defendant Williams invoked his faith in God as the basis for his prescribing MS-Contin for plaintiff, on March 28, 2003, and plaintiff listened politely even though he is "not a believer in a single power or entity."  Id., at ¶¶ 15-16.  Plaintiff declares that he was prescribed the MS-Contin from March 28, 2003, until May 5, 2003, the day that defendant Williams told plaintiff that he "had to undergo radical medical procedures or suffer pain"; defendant Williams equated plaintiff's refusal of medical treatment to a suicide or death wish.  Id., ¶¶ 17, 19.

In his own declaration, defendant Williams acknowledges that medical records reveal that he prescribed MS-Contin for plaintiff's pain complaints in April of 2003; he asserts that the prescription was discontinued after Dr. Friend, a pain specialist, recommended that plaintiff be taken off the drug.  MSJ, Ex. C, ¶ 3.  Plaintiff objects that Dr. Friend's recommendation could not have been the reason defendant Williams discontinued the prescription because Dr. Friend had not seen plaintiff since the year 2000.  Opp., Ex. A, ¶ 32. However, the undersigned notes that defendant Williams does not state that Dr. Friend recommended discontinuing the medication subsequent to Williams' having prescribed it. Rather, the court logically infers that defendant Williams became aware of Dr. Friend's prior recommendation at some point after having prescribed plaintiff MS-Contin, perhaps after a more thorough review of plaintiff's medical records, which, arguably, should have occurred prior to

1 Williams having written the prescription in the first place.

2       With regard to defendant Sainz, plaintiff seems to have the least quarrel with him,

3 stating that he was "usually available" and responsive; that he called plaintiff for a consultation

4 regarding a second medical opinion; that he agreed with plaintiff that Dr. Friend was not a cancer

5 pain specialist, but rather that he was asked to evaluate plaintiff to determine other causes for

6 plaintiff's chronic pain.  Opp., p. 14, Ex. C, plaintiff's dec. re: defendant Sainz, ¶ 10.  Plaintiff

7 asserts that defendant Sainz's admission with respect to the pain specialization of Dr. Friend

8 occurred during a conversation between them.  What plaintiff does not make clear is the need for

9 his assessment by a cancer pain specialist in light of the finding by the court-appointed

10 independent medical expert that plaintiff's prostate cancer could not be causing him pain at this

11 point.

12       Plaintiff declares that defendant Sainz provided him with adequate medical care

13 and effective pain relief, from August 23, 2000, until March, 2001, at which point he decided not

14 to challenge the status quo at MCSP or the decisions of defendants Douglas and Smith, despite

15 his awareness that prostate cancer, from which plaintiff suffers, is a painful disease.  Opp., Ex. C,

16 ¶¶ 3-6, 13-14.  Plaintiff states that he told defendant Sainz that former defendant Schimon never

17 performed a physical examination of plaintiff before preparing a report and recommendations.

18 Opp. Ex. C, ¶ 12.  Plaintiff's contentions with this defendant, as with the others, however, comes

19 down to a disagreement with the palliative care he is receiving, as defendants note in their reply

20 (p. 2), noting plaintiff himself states in his opposition (p. 14) that defendants "agree to disagree

21 with plaintiff."  Plaintiff does not maintain that he is not receiving medication for pain relief for

22 his prostate cancer, Hepatitis C virus, and osteoarthritis; rather, he argues that he is wrongly

23 denied adequate and effective pain relief, in essence because he is being denied a particular

24 narcotic medication, MS-Contin.  As set forth above, mere differences of opinion concerning the

25 appropriate treatment cannot be the basis of an Eighth Amendment violation.  Jackson v.

26 McIntosh, 90 F.3d 330; Franklin v. Oregon, 662 F.2d at 1344.

1          Further, the court's appointed independent medical expert lends no support to

2   plaintiff's position.  Dr. Evans' findings followed his own detailed review of plaintiff's extensive

3   medical record (700 pages plus) and his consultation with a distinguished group of medical

4   experts of several medical specialities at a renowned university medical teaching hospital.  In

5   fact, among the injunctive relief sought by plaintiff in bringing this action was to receive medical

6   care at this very same hospital, the University of California at Davis Medical Center in

7   Sacramento.  Had Dr. Evans found the medical reports, lab work and diagnoses submitted to

8   him insufficient, he would have so advised the undersigned and, this court, based on its

9   independent medical expert's finding of a medical necessity, could have authorized additional

10  tests or lab work or permitted any additional physical examination of the plaintiff.  Dr. Evans

11  also had the authority to recommend to the court that plaintiff needed MS-Contin as a pain

12  medication.  That Dr. Evans took none of these actions clearly demonstrates that he found the

13  medical evaluations and lab reports presented to him to be a comprehensive record from which

14  he could render a diagnosis and prognosis, obviating any need for any additional assessment of

15  plaintiff's medical conditions and concluding that plaintiff's medical conditions did not warrant

16  relief in the specific form sought by plaintiff.  It is the inescapable conclusion of Dr. Evans and

17  the colleagues with whom he consulted that plaintiff "has received appropriate care and that the

18  administration of narcotics would be inappropriate for the treatment of his prostate cancer."

19  Further, Dr. Evans made clear that while plaintiff has a "history of opiate dependence," that he

20  and his colleagues "based our discussion and decision upon the medical data regarding his

21  prostate cancer and feel that based on that and that alone, narcotics are not warranted for the

22  treatment of his prostate cancer."

23          The court appointed an independent medical expert because in cases involving

24  complex medical issues, like this one, wherein plaintiff contests the type of treatment he has

25  received, expert opinion is almost always necessary to establish the necessary level of deliberate

26  indifference.  See Hutchinson v. United States, supra, 838 F.2d 390.  The undersigned took the

1   extraordinary step of providing plaintiff with an independent medical analysis to afford him

2   every opportunity to support his claims of inadequate medical treatment despite the

3   representations of the defendant medical experts.  This analysis plainly demonstrates that

4   plaintiff has not been subjected to deliberate indifference by these defendants and plaintiff has

5   thus been unable to create a material issue of fact.  Summary judgment should be entered for

6   defendants Williams, Douglas, Smith and Sainz.

7                          *Defendants Knowles and Campbell*

8                In the first place, defendant Campbell has been substituted in in her official

9   capacity for defendant Knowles, sued only in his official capacity, in this action seeking

10  prospective injunctive relief.  Thus, defendant Knowles has not been a party to this action since

11  he left his job as warden of MCSP, and is entitled to summary judgment on that basis alone.  In

12  the second place, the court having found that the physician defendants have not violated

13  plaintiff's constitutional rights, plaintiff raises no genuine issue of material fact that defendant

14  Campbell, named only in her official capacity as acting warden, has deprived him of his

15  constitutional rights.  Finally, as defendants note in their reply (p.1, n.1), plaintiff sets forth no

16  opposition to defendants' motion with respect to the declarations of these defendants.

17  Defendant Campbell is thus also entitled to summary judgment.

18                Accordingly, IT IS HEREBY RECOMMENDED that defendants' motion for

19  summary judgment, filed on June 30, 2006, be granted, and judgment be entered for defendants.

20                These findings and recommendations are submitted to the United States District

21  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

22  days after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25  shall be served and filed within ten days after service of the objections.  The parties are advised

26  \\\\\

1  that failure to file objections within the specified time may waive the right to appeal the District

2  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  DATED: 2/22/07

4                                                                    /s/ Gregory G. Hollows

5                                                                    _____
                                                                     GREGORY G. HOLLOWS
                                                                     UNITED STATES MAGISTRATE JUDGE

6  GGH:009
   mena2024.msj

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26